742 So.2d 690 (1999)
STATE of Louisiana
v.
Kenneth HILL.
No. 98-KA-1087.
Court of Appeal of Louisiana, Fifth Circuit.
August 31, 1999.
*692 Paul D. Connick, Jr., District Attorney, Thomas J. Butler, Terry M. Boudreaux, Deborah A. Villio, Joseph Roberts, Assistant District Attorneys, Gretna, Louisiana, Counsels for plaintiff-appellee.
Laurie A. White, New Orleans, Louisiana, Counsel for defendant-appellant.
Court composed of Judges H. CHARLES GAUDIN, SOL GOTHARD, and MARION F. EDWARDS.
GAUDIN, Judge.
Kenneth Hill was convicted by a jury of the May 2, 1997 second degree murder of Reverend Wilson Smith at a Shell service station in Westwego, Louisiana. We affirm, remanding only for the correction of several minor errors patent.
Hill was indicted in Jefferson Parish for first degree murder along with Israel McPherson. Hill later filed a motion to sever the defendants, which was granted. After the state amended the indictment to second degree murder, Hill was tried on May 5-12, 1998 and found guilty as charged and sentenced to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
On appeal, Hill assigned these district court errors:
(1) in violation of appellant's right against self-incrimination under the Fifth Amendment of the United States Constitution and Article 1, Section 13 of the Louisiana Constitution of 1974, the trial court improperly permitted admission of inculpatory statements of the defendant into evidence,
(2) in violation of appellant's right against self-incrimination under the Fifth Amendment of the United States Constitution and Article 1, Section 13 of the Louisiana Constitution *693 of 1974, the trial court erroneously permitted an improperly obtained statement from this juvenile defendant which although exculpatory in nature, was used inculpatorily against him,
(3) he was denied his right to due process of law under the Fourteenth Amendment to the United States Constitution and Article 1, Section 2 of the Louisiana Constitution as there was insufficient evidence to support the verdict,
(4) the state failed to prove essential elements of the crime,
(5) the trier of fact misunderstood internally inconsistent testimony provided by a witness who did not even believe the information he received from appellant that he was relating to the jury,
(6) appellant's due process rights were violated when irrelevant and highly prejudicial testimony was allowed in at trial pertaining to the victim's wife,
(7) his right to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and Article 1, Sections 2 and 16 of the Louisiana Constitution of 1974 was violated because counsel failed in numerous ways to provide legal representation appropriate to the standards required to provide the appellant with requisite constitutional safeguards,
(8) the trial court erred when it allowed the state to admit large, gruesome photographs of the victim into evidence, thus prejudicing the appellant before the jury and violating appellant's right to a fair trial pursuant to the Sixth and Fourteenth Amendments to the United State Constitution and Article 1, Sections 2 and 16 of the Louisiana Constitution of 1974 and the Louisiana Code of Evidence, Article 403,
(9) the trial court erred in giving the jury an erroneous instruction regarding an essential element of the offense charged which prejudiced appellant in violation of Louisiana Code of Criminal Procedure Article 802 and Due Process Clause of the Fourteenth Amendment to the United States Constitution,
(10) his sentence of life imprisonment, as imposed against a sixteen year old, is excessive in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 1, Section 20 of the Louisiana Constitution of 1974,
(11) the trial court improperly held appellant in contempt of court when he was unrepresented, in violation of his Louisiana and United States constitutional rights, and
(12) appellant requests review of the entire record for errors patent pursuant to Article 920 of Louisiana Code of Criminal Procedure.
Neither Hill nor McPherson, whose nickname is "Panoose", was arrested at the murder scene. When deputies arrived at approximately 11 p.m., they found Reverend Smith lying face-down, bleeding from the face, neck and hand. He died of a gunshot wound to his neck.
During the subsequent investigation, police canvassed the neighborhood adjacent to the Shell station looking for witnesses. Hill, who resided on nearby Patton Lane, was among those contacted by Deputy Wayne Hines.
Deputy Hines testified that Hill told him that he and two friends, including McPherson and a person called Damien, had been at his (Hill's) house before walking to the Shell station where they saw two others, named Norman and Freddy, sitting near a dumpster. Freddy, Hill told Deputy Hines, had a pistol.
At the station, Hill said he saw Revered Smith pay for something at the cashier's *694 window and then walk back toward his station wagon near the gasoline pumps. When Hill, McPherson and Damien were walking back toward Hill's home a short time later, Hill told Deputy Hines, they heard three or four gunshots. They looked around but didn't see anything.
After speaking with Deputy Hines, Hill went voluntarily to the sheriffs office, where Lieutenant Maggie Snow conducted what she considered to be a witness interview. The interview was tape-recorded and transcribed. Hill gave Lt. Snow essentially the same information he had given Deputy Hines. Lt. Snow testified that after taking Hill's statement, she received information that led her to believe Hill and Israel McPherson were responsible for the murder.
On the night of May 3, 1997, Hill advised Lt. Snow that he wished to modify his version of the incident. Lt. Snow took a second recorded statement from Hill in the presence of his step-mother, Michelle Brown. Hill said he accompanied McPherson to the Shell station and that McPherson shot Reverend Smith in the course of a robbery attempt. During the interview, Hill identified McPherson in a photograph shown to him by Lt. Snow.
Later on the night of May 3, 1997, Detective Michael Moscona conducted another interview with Hill. Ms. Brown was again present. This statement was consistent with Hill's statement to Lt. Snow.
After Hill and McPherson were placed under arrest, Detective Moscona obtained a search warrant for Hill's residence. Detective Terry Graffeo executed the warrant. Among the evidence seized were three white tee shirts. One of those shirts was specially sealed and sent for DNA analysis. The state produced the DNA test results at trial but they were inconclusive because the blood sample from this tee shirt was so small it provided only a partial genetic profile.
McPherson informed officers that he had left the murder weapon with his friend, Ellison Harper. McPherson directed Colonel Walter "Tom" Gorman and Lt. Snow to Harper's residence at 426 Klein Avenue, Apartment A. Harper allowed the officers inside and gave Detective Gorman a .38 caliber Taurus revolver. McPherson identified the gun as his. Harper testified at trial that McPherson is a friend of his, and that McPherson asked him to take the gun at midnight or 1:00 a.m. on May 3, 1997.
Louise Waltzer, an expert in the field of firearms examination, testified that she compared the bullet fragments recovered at the murder scene. Several fragments were too damaged to allow for an accurate assessment but one fragment matched the weapon recovered from Harper.
Crystal Walker testified that she went to the Shell station at about 10:50 on the night of the murder to buy ice cream. While there she encountered Hill and McPherson. She said she knew Hill from seeing him in the neighborhood, but had never met McPherson before that night. McPherson flirted with her, and asked for her telephone number. Ms. Walker stated she did not see Reverend Smith. When she left the station a short time later in her car, Hill and McPherson were walking around the side of the building. She described Hill as wearing a white tee shirt, black shorts and black Reebok tennis shoes. McPherson wore a blue tee shirt with long pants and tennis shoes. Neither man wore a hat. She testified that she saw an unidentified object sticking out of McPherson's pocket.
Joan Knoten, who lives behind the Shell station, testified that she heard three gunshots at 11:00 p.m. on May 2, 1997. She went to a window and saw two black men running from the station. One jumped from a high wall at the station, and the other had already done so. She could not see the men's faces. There was no one else in the parking lot. She described one man as wearing light colored shorts and a cap, and the other as wearing dark pants.
*695 Tori Sylvester testified that he lives on Patton Lane next door to where McPherson lived and two doors from Hill's house. On his way home on the night of May 2, 1997, he saw the police activity at the Shell station, and assumed someone had been killed. On the morning of May 3, 1997, Hill told Sylvester he had "shot the man." Hill told Sylvester he had struggled with the victim over the gun, and it had fired.
At the trial, Hill called McPherson as a witness but McPherson invoked his Fifth Amendment right to remain silent and not testify.

ASSIGNMENTS 1 AND 2
These assignments of error relate to the three recorded statements Hill made the day following the murder. The first statement began at 5:09 p.m., the second at 9:37 p.m. and the third at 11:46 p.m. Hill filed a pre-trial motion to suppress, which was denied. The state then filed a notice of intent to use and introduce the statements in compliance with LSA-C.Cr.P. art. 768.
In the first statement, in which Hill pointed an accusatory finger at Norman and Freddy, neither Ms. Brown nor any other adult was present. Hill was then 15 years of age. On his own accord, Hill had told Deputy Hines that he had information about the shooting. Hill was part of the STAR program, a community policing arm of the sheriff's office. Hill did not inculpate himself or McPherson when he spoke with Deputy Hines.
Hill then went voluntarily to the criminal investigations bureau for the second interview. Lt. Snow asked Hill, who was still not considered a suspect but only a witness, if he would submit to a polygraph test. This proposed test was mentioned during the motion to suppress hearing but not during the trial. Hill agreed. Lt. Snow then attempted to locate Hill's parents. She learned that Hill's father was out of town but that his step-mother, Ms. Brown, was available.
In Ms. Brown's presence, Hill stated that he wished to change his story. Lt. Snow advised Hill of his Miranda rights from a juvenile rights form. Lt. Snow fully explained the form to Hill and Ms. Brown, and allowed them time alone to discuss it. On the form Hill indicated he had completed the eighth grade in school. Hill and Ms. Brown signed the form, indicating that they understood the rights as told to them, and that Hill wished to waive his rights and make a statement. Lt. Snow thereafter conducted the second interview in Ms. Brown's presence.
During this interview Hill said he and McPherson were together at the service station. Crystal was there, and McPherson talked with her for a while. Reverend Smith pulled up in his station wagon, and paid for something at the cashier's window. McPherson proposed to Hill that they rob Reverend Smith and split the money. Hill told McPherson that he did not want to be involved. McPherson approached Reverend Smith, who was picking up empty cans in the parking lot, and attempted to hit him with his pistol. According to Hill the gun went off. As the victim fell, McPherson shot him several times and fled the scene. Hill fled in a different direction and returned home.
Detective Moscona took the third statement from Hill at the detective bureau. By this time, the police had received information that led them to focus on Hill as a suspect. Detective Moscona showed Hill and Ms. Brown the rights form they had completed with Lt. Snow, and asked them if they recognized it. They replied that they did. He further asked whether Hill was willing to continue the waiver of his rights and submit to another interview. They agreed.
Hill stated that as he and McPherson walked to the Shell station, McPherson showed him his pistol, which he wore tucked into the waist band of his trousers. McPherson said he carried the gun for protection. At the station, McPherson saw that Reverend Smith had money in his *696 wallet and he suggested to Hill that they rob Reverend Smith. Hill also said that he knew McPherson had served five years in jail for shooting Freddy.
Hill argues that his statements, particularly the first one involving Deputy Hines when Ms. Brown was not present, should have been excluded from evidence. Although the first statement was not inculpatory per se, Hill contends, it was used prejudicially along with the second and third statements to prove him a liar. Hill cites State v. Fernandez, 712 So.2d 485 (La.1998), and State in the Interest of Dino, 359 So.2d 586 (La.1978).
As Hill points out, the first statement was not inculpatory; in fact, he aimed suspicion at two others. Police officers going through a neighborhood following a serious crime are not obligated to read Miranda rights to potential or even actual witnesses. Only when a person becomes a suspect does the police obligation change. When Hill voluntarily spoke with Deputy Hines he (Hill) was definitely not in custody and there is no suggestion in this record of any police coercion or pressure.
Considering the totality of the circumstances, the trial judge did not err in accepting the three statements as relevant evidence.

ASSIGNMENTS 3 AND 4
Here, Hill says the essential elements of the crime were not proven; consequently, the evidence did not support the guilty verdict. Hill argues that there was no proof that he had specific intent to commit second degree murder and that there was no proof anything was taken from Reverend Smith. The victim's wallet was not removed from his person.
The standard to be used by an appellate court in evaluating the sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of every element of the crime charged. See Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) and State v. Mussall, 523 So.2d 1305 (La.1988).
Second degree murder is the killing of a human being when the offender has specific intent to kill or inflict great bodily harm or when the offender is engaged in the perpetration or attempted perpetration of armed robbery even though he has no intent to kill or inflict great bodily harm, reference pertinent parts of LSA-R.S. 14:30.1. One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. See State v. Dunn, 651 So.2d 1378 (La.App. 5 Cir.1995).
The testimony at trial indicates that Hill probably was not the gunman. The state's apparent objective was to prove that Hill was at least a principal to the murder. LSA-R.S. 14:24 provides:
"All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals."
Reverend Smith was shot three times, in the cheek, in the neck and in one of his hands. The evidence showed that the pistol was placed against Reverend Smith's neck when the fatal bullet was fired. Specific intent to kill can be inferred from these facts.
According to Hill's statement to Detective Moscona, McPherson told Hill he was going to rob Reverend Smith. Although nothing was actually taken from the victim, there is little doubt robbery was intended and no doubt that a weapon was involved in the attempt.
Sylvester testified that Hill told him that he had shot Reverend Smith but Sylvester further said that he didn't believe Hill as he was known to lie to enhance his street *697 reputation. Hill's statement in this regard is further contradicted by testimony that it was McPherson who directed police officers to the murder weapon and also by the testimony of Harper who received the pistol from McPherson several hours after the murder had occurred.
In any event, Hill was at the murder scene with knowledge by his own admission that McPherson planned to rob Reverend Smith and he (Hill) remained with McPherson. Hill said or did nothing to prevent the crime and he did not come to Reverend Smith's aid after the shooting. Instead, he and McPherson fled. From this evidence, the jury found that Hill was at least a principal. We cannot say the Jackson v. Virginia standard was not satisfied. It is not the function of this Court to assess credibility or reweigh evidence.

ASSIGNMENT NO. 5
This assignment of error relates to Sylvester's testimony. The jury listened to this witness' testimony and there is no indication they (the jurors) were misled.

ASSIGNMENT NO. 6
Reverend Smith's daughter Marita testified at trial. She said her mother (and Reverend Smith's wife) could not be present because she had suffered three strokes and a heart attack since the murder. This testimony, Hill contends, was irrelevant and prejudicial.
A determination of relevancy is within the sound discretion of the trial judge, whose ruling is not disturbed absent an abuse of discretion.
Marita Smith's testimony about Mrs. Smith was brief. The rest of Marita's testimony dealt with Reverend Smith's activities the night of the murder, the recovery of his wallet, etc., subjects pertinent to the charged offense.
Even if it was inadvertent to allow Marita Smith to mention her mother's strokes and heart attack, the error was harmless and did not contribute to the guilty verdict.

ASSIGNMENT NO. 7
Hill believes he did not receive effective assistance of counsel because he did not challenge the validity of a search warrant and because he did not object to the state's DNA evidence, which was inconclusive and which was countered by the defense's DNA expert. A claim of ineffective assistance of counsel is more appropriately raised through and in an application for post-conviction relief. See State v. Truitt, 500 So.2d 355 (La.1987), and many other cases with similar holdings.
An appellate court can, in the interest of judicial economy, address this issue on direct appeal if the record contains sufficient evidence of ineffectiveness. Such is not the case here.

ASSIGNMENT NO. 8
By this assignment, Hill argues that the trial court erred in allowing the admission of autopsy photographs of the murder victim that were so gruesome they were prejudicial. Post-mortem photographs at the scene or autopsy photographs of murder victims are admissible to prove corpus delicti, for positive identification of the victim, to corroborate other evidence establishing the cause of death, the manner in which death occurred and the location, severity, and number of wounds. See State v. Koon, 704 So.2d 756 (La.1997), and State v. Walker, 650 So.2d 363 (La.App. 5 Cir.1995), writs denied at 656 So.2d 1013 (La.1995).
The photographs in question were admitted in conjunction with the testimony of Dr. Fraser McKenzie, who performed the autopsy. The trial judge overruled the defense's objection, apparently being of the opinion that the probative value of the photographs, tied to Dr. McKenzie's testimony, outweighed any prejudicial effect.
*698 Our review of the photographs supports the trial judge's ruling.

ASSIGNMENT NO. 9
Hill argues in this assignment that the trial judge committed reversible error in improperly instructing the jury as to the law on specific intent. A timely objection was not made in the trial court, which generally precludes appellate review. Nevertheless, we considered this contention.
We note initially that Hill's trial attorney stated that the trial judge had made the corrections he wanted and that he was satisfied with the instructions.
Hill's appellate counsel finds reversible fault with this wording: "You may infer the defendant intended the natural and probable consequences of his act."
The standard for reviewing jury charges requires that the charges be read as a whole. A verdict will not be set aside because of a challenged jury charge unless such portion, when considered in the context of the entire charge, is determined to be erroneous and prejudicial. See State v. Allen, 707 So.2d 72 (La.App. 5 Cir.1998), writs denied at 719 So.2d 1054 (La.1998). In the instant case, the trial judge instructed the jury as to the definitions of specific criminal intent and general criminal intent. The judge then explained, "Whether criminal intent is present must be determined in light of ordinary experience. Intent is a question of fact which may be inferred from the circumstances". The judge then gave the charge of which Hill complains: "You may infer that the defendant intended the natural and probable consequences of his acts."
The Louisiana Supreme Court has approved such language in State v. Mitchell, 674 So.2d 250 (La.1996) cert. denied at 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 538 (1996), and State v. Copeland, 530 So.2d 526 (La.1988). From State v. Mitchell:
"Defendant contends that the trial court improperly instructed the jury in the guilt phase that it `may infer that the defendant intended the natural and probable consequences of his acts.' He argues that he objected to this instruction at trial on the ground it created an improper presumption under Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979).
"In Sandstrom, the Court held that the trial judge erred in instructing the jury that `the law presumes that a person intends the ordinary consequences of his voluntary acts,' since this instruction could be considered to be a mandatory presumption by the jury and thus improperly shift the burden of proof from the state. In State v. Copeland, 530 So.2d 526, 539 (La.1988), we stated:
"The mere use of the word `presume' raises the spectre of a Sandstrom-type problem. For that reason, the preferable instruction is `... you may infer that the defendant intended the natural and probable consequences of his acts ...'"
"In the instant case, the trial judge's instruction follows the language we approved in Copeland. Clearly, the instruction does not set forth a conclusive presumption shifting the burden of proof from the state to defendant. Accordingly, this instruction was not erroneous."
The charge read in Hill's trial was correct.

ASSIGNMENT NO. 10
Hill was 16 years of age when sentenced to life imprisonment. In her reasons for sentencing, the trial judge noted that Hill exhibited deliberate cruelty to the victim and that the offense resulted in significant loss to Reverend Smith's family.
The contention that a mandatory life sentence for second-degree murder is a violation of the constitutional prohibition against excessive punishment has been repeatedly rejected, even when the offender is a juvenile. State v. Wilkerson, 704 So.2d 1 (La.App. 1 Cir.1997), writs denied *699 at 717 So.2d 646, (La.1998); State v. Pilcher, 655 So.2d 636 (La.App. 2 Cir.1995) writs denied at 662 So.2d 466 (La.1995); and State v. Payne, 482 So.2d 178, (La. App. 4 Cir.1986) writs denied at 487 So.2d 436 (La.1986).
We cannot say that Hill's sentence was grossly disproportionate to the crime or that it constitutes needless and purposeless suffering.

ASSIGNMENT NO. 11
Hill here argues that the record does not show he was represented by counsel on July 30, 1998 when the trial judge imposed a sentence for contempt. The contempt ruling arose from Hill's behavior at his June 16, 1998 sentencing hearing. The minute entry for July 30, 1998 clearly shows that Hill was represented that day by his attorney.

ERRORS PATENT
We found two errors patent.
Hill was not told of the three-year prescriptive period for filing for post-conviction relief. We remand for the trial court to send appropriate notice to Hill and to place proof in the record that the notice was received.
Also, Hill was not given credit for time served. We remand for whatever clerical corrections are necessary. The granting of credit for time served is not discretionary, LSA-C.Cr.P. art. 880.
We remand only for Art. 930.8 notice to be sent and for Hill to be given credit for time served. Otherwise, his conviction and sentence are affirmed.
CONVICTION AND SENTENCE AFFIRMED; REMANDED ONLY FOR MINOR ERRORS PATENT TO BE CORRECTED.