960 So.2d 1142 (2007)
STATE of Louisiana
v.
Morris D. McFARLAND.
No. 07-KA-26.
Court of Appeal of Louisiana, Fifth Circuit.
May 29, 2007.
*1143 Paul D. Connick, Jr., District Attorney, Twenty-Fourth Judicial District, Parish of *1144 Jefferson, Terry M. Boudreaux, Anne Wallis, Donald Rowan, Assistant District Attorneys, Gretna, Louisiana, for Plaintiff/Appellee.
Holli A. Herrle-Castillo, Louisiana Appellate Project, Marrero, Louisiana, for Defendant/Appellant.
Panel composed of Judges EDWARD A. DUFRESNE, JR., THOMAS F. DALEY, and WALTER J. ROTHSCHILD.
WALTER J. ROTHSCHILD, Judge.
Defendant, Morris McFarland, was indicted by a grand jury charging him with second degree murder in violation of LSA-R.S. 14:30.1.[1] Brian Fullilove, Luther McFarland, Yarnell McFarland, and Derrick Williams were also indicted.[2]
Morris McFarland pled not guilty at arraignment. On January 20, 2005, the co-defendants were severed. On this same date, after a hearing, the trial judge denied the Morris McFarland's motion to suppress his statement and identification. The trial judge also denied a motion to quash the arrest warrant, which was filed by Fullilove and adopted by Morris McFarland.
On June 6, 2005, the defendant proceeded to trial before a twelve-person jury, which found him guilty as charged the next day. The defendant filed a motion for a new trial, which the trial judge denied prior to sentencing the defendant on June 13, 2005. The trial judge sentenced the defendant to life imprisonment at hard labor without benefit of probation, parole, or suspension of sentence. This timely appeal follows.
FACTS
On May 10, 2004, Arthur Buras was living in one side of a double located at 2819 Tugie Drive in Metairie. Sometime after midnight, he heard loud noises coming from the other side of the double, 2817 Tugie Drive, where the victim, 23-year-old Coulton Lyell, Jr., lived.[3] Mr. Buras looked out of his bedroom window and saw three black males trying to break through the victim's front door. After the fourth man entered the door, Mr. Buras heard a lot of muffled yelling and then heard what he believed was a gunshot.[4] When he looked outside of the front window, he saw three black males running down Tugie Drive toward Park Manor. When they reached the stop sign, they started walking toward Lafreniere Drive. Mr. Buras never got a good look at any of their faces. Mr. Buras called 911 at 12:46 a.m. to report what he had seen.
Sergeant Donald Meunier, Lieutenant Dennis Thronton, and other officers of the Jefferson Parish Sheriff's Office responded and found the victim on the floor in a bedroom with a gunshot wound to the neck. The State's forensic expert, Dr. Ross, testified the victim sustained a gunshot wound to the left side of his neck, which resulted in injury to the left lung. The victim also had patterned abrasions on his left forehead and a separate abrasion just above the left side of his eyebrow. Based on the gunpowder marks, or stippling, near the wound, Dr. Ross concluded that the gun was fired between one and three feet from the victim. The victim's toxicology test revealed the presence of marijuana, MDMA, also known as, "Ecstacy", *1145 cocaine, methadone, benzodiazepine, and opiate.
Based on the crime scene, the police concluded the victim was in the bed at the time of the shooting. They found his wallet, containing over $200 in cash on the bedroom floor. Police found a dresser drawer opened in the bedroom. A .40 caliber casing was recovered from the scene. The police found the front door opened, with shoe prints on it. The deadbolt and door frame were damaged. The back door, which was a partial-glass paned door, showed signs of forced entry.
During the course of a lengthy investigation, the police learned information that led them to target a residence in the 6500 block of Park Manor that was associated with the victim's girlfriend, Kelly Cochran. The police ultimately honed in on, Brian Fullilove, Luther McFarland, Yarnell McFarland, and Derek Williams as suspects. A warrant for the defendant's arrest was issued on August 6, 2004, and the defendant was arrested the same day.
Later that day, the defendant made a tape-recorded statement, which was admitted in evidence and was played for the jury at trial. The defendant said he had previously obtained methadone wafers from the victim in the past months. On May 9, 2004, the defendant's sister, Yarnell, telephoned him to say that she had obtained some cocaine from the victim. The defendant went to Yarnell's residence, where she had the cocaine on the scale. By tasting the cocaine, the defendant determined that it was not good. He brought Yarnell to the victim's house and told the victim to return her money.
Defendant stated he then went to a barbeque at his sister's home, where she gave the defendant and Brian Fullilove some cocaine. After Yarnell told the defendant and Brian that she had seen one-half kilo of cocaine in the victim's house, they began discussing taking the cocaine if no one was home. The plan was that Yarnell and Danny Jackson, who was her boyfriend, would go out with the victim and his girlfriend, Kelly Cochran, so that no one would be home when the defendant, Brian, Luther McFarland, and Derrick Williams took the cocaine from the victim's house. Initially, Luther said he did not want to go. So, the defendant and Brian went to Derrick's house to discuss the plan. After they left Derrick's, Luther called and said that he wanted to go. The defendant, Brian, and Derrick then went to pick up Luther.
When the defendant reached Tugie Drive, he had planned to park and the four of them were going to walk to the victim's house. However, Brian told the defendant that he did not want the defendant to go with them. After dropping off Brian, Derrick and Luther, the defendant drove to Yarnell's house on Park Manor. He first called Kelly, but when she did not answer, he called Yarnell. When he told Yarnell that the plan was underway, she told the defendant that the victim was still in the house. Fearing something had gone wrong, the defendant walked toward the victim's house. He saw Brian, Derrick and Luther walking towards him. The defendant learned that Luther shot the victim in the neck. When the defendant asked if the victim was dead, they replied that the victim was holding his neck and moaning. The defendant surmised Luther was trying to awaken the victim to find out the location of the drugs.
The defendant said that they told him that they could not get in the back door, so they broke through the front door. The defendant said that they told him that Luther cocked the gun as soon as he walked in. The victim was sleeping and the gun went off when Luther hit him across the head to wake him up. They searched the house, but left empty-handed. The defendant said he had seen Luther *1146 with a black "Glock 40" on prior occasions, since Luther was staying with the defendant at the time. The defendant regretted that the victim had been killed. The defendant acknowledged that he told Danny Jackson about the shooting a few days later.
At trial, the defendant testified largely consistent with his statement. However, the defendant added that the reason he did not enter the house with the others was because he did not believe they should break into someone's house. In addition, the defendant clarified that Luther was at the barbeque earlier in the day when Yarnell said that the victim had cocaine in the house. Defendant testified that he told them he wanted nothing to do with it if anyone was going to have a weapon. The defendant admitted he drove the others to the victim's house, but denied he had any part in the plan to burglarize the house. He claimed he did not contact the police soon after shooting because he was afraid.
Ryan Farrell, the defendant's employer at Budget Tree service, testified that the defendant was a good worker, and that he would hire him if the defendant were ever able to work for him again.
DISCUSSION
The defendant raises issues regarding the sufficiency of the evidence and another alleged trial error. When the issues on appeal relate to both the sufficiency of evidence and one or more trial errors, the reviewing court should first determine the sufficiency of the evidence by considering the entirety of the evidence. State v. Hearold, 603 So.2d 731, 734 (La. 1992). If the reviewing court determines that the evidence was insufficient, then the defendant is entitled to an acquittal, and no further inquiry as to trial errors is necessary. Id. On the other hand, when the entirety of the evidence, both admissible and inadmissible, is sufficient to support the conviction, the defendant is not entitled to an acquittal, and the reviewing court must then consider the assignments of trial error to determine whether the accused is entitled to a new trial. Id. Therefore, the sufficiency of the evidence is addressed before the other assignment.
The defendant contends that the evidence was insufficient to support his conviction because the State failed to prove that he had the intent to commit the underlying felony of aggravated burglary. The State responds that a rational factfinder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that the defendant was guilty of second degree murder.
The constitutional standard for testing the sufficiency of the evidence, as enunciated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), requires that a conviction be based on proof sufficient for any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, to find the essential elements of the crime beyond a reasonable doubt. State v. Ortiz, 96-1609 (La.10/21/97), 701 So.2d 922, 930, cert. denied, 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998). The rule as to circumstantial evidence is "assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence." LSA-R.S. 15:438. This is not a separate test from the Jackson standard, but rather provides a helpful basis for determining the existence of reasonable doubt. State v. Wooten, 99-181 (La.App. 5 Cir. 6/1/99), 738 So.2d 672, 675, writ denied, 99-2057 (La.1/14/00), 753 So.2d 208. Ultimately, all evidence, both direct and circumstantial, must be sufficient to support the conclusion that the defendant is guilty beyond a reasonable doubt. Id.
Second degree murder is defined as the killing of a human being when the offender *1147 1) has specific intent to kill or to inflict great bodily harm; or 2) is engaged in the perpetration or attempted perpetration of one of several enumerated felonies, including aggravated burglary, even though he has no intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1(A). See, State v. Kirkland, 01-425 (La.App. 5 Cir. 9/25/01), 798 So.2d 263, 268, writ denied, 01-2967 (La.10/14/02), 827 So.2d 415.
"All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." LSA-R.S. 14:24. See, State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1225. Only those persons who "knowingly participate in the planning or execution of a crime" are principals to that crime. State v. Pierre, 93-0893 (La.2/3/94), 631 So.2d 427, 428. Mere presence at the scene of a crime does not make one a principal to the crime. Id. A defendant may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Pierre.
In its brief, the State contends that it proved the defendant was guilty as a principal to felony murder when the victim was killed during the commission of an aggravated burglary, which the defendant helped to plan and in which he facilitated.
According to LSA-R.S. 14:60, aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, if the offender is armed with a dangerous weapon; or after entering arms himself with a dangerous weapon; or commits a battery upon any person while in such place, or in entering or leaving such place.
To be guilty as a principal to a burglary, the offender does not have to personally enter the building. See, State v. Ortiz, 701 So.2d at 931, citing State v. Kimble, 375 So.2d 924 (La.1979). And, while possession of a dangerous weapon is an essential component of the commission of the aggravated burglary, a person may be a principal to the offense even though he did not personally have possession of the weapon used in the commission of the crime. Ortiz, citing State v. Dominick, 354 So.2d 1316 (La.1978). One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. State v. Hill, 98-1087 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, 696, writ denied, 99-2848 (La.3/24/00), 758 So.2d 147.
One part of the defendant's challenge to his conviction in the instant case is that he did not intend to commit an aggravated burglary because he did not believe anyone would be home. However, aggravated burglary requires the dwelling to be inhabited, but does not require the presence of a person at the time of the offense. See, State v. Powers, 344 So.2d 1049, 1052 (La.1977), "Here, the aggravated burglary of the empty residence had completely taken place before [the victim] returned home." Thus, the fact that the defendant believed the house to be empty is irrelevant to whether he had the intent to commit an aggravated burglary.
The defendant also contends the evidence was insufficient to convict him because he did not know Luther was armed. However, under general principles of accessorial liability, all parties to a crime are guilty for the deviations from the common plan, which are the foreseeable consequences of carrying out the plan. See, State v. Smith, 98-2078 (La.10/29/99), 748 So.2d 1139, 1143, internal citations omitted.[5] The risk that an unauthorized *1148 entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary which every party to the offense must accept no matter what he or she actually intended. Id.
In State v. Lozier, 375 So.2d 1333, 1337 (La.1979), the Louisiana Supreme Court observed that:
[b]urglary laws are not designed primarily to protect the inhabitant from unlawful trespass and/or the intended crime, but to forestall the germination of a situation dangerous to the personal safety of the occupants. . . .
In the archetypal burglary an occupant of a dwelling is startled by an intruder who may inflict serious harm on the occupant in his attempt to commit the crime or to escape from the house. The frightened occupant, not knowing whether the intruder is bent on murder, theft, or rape, may in panic or anger react violently, causing the burglar to retaliate with deadly force.
Thus, the fact that the defendant claimed he did not know Luther was armed does not absolve him from responsibility, as the risk that the unauthorized entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary which every party to the offense must accept no matter what he or she actually intended. See, State v. Smith, 748 So.2d at 1143.
Moreover, the defendant's statement to the police clearly reflects that he was integrally involved in the plan and that he knew Luther had a gun when entering the victim's house. At the barbeque, the defendant and others hatched a plan to enter the victim's house later that evening and steal the cocaine Yarnell had seen. The defendant said he asked Danny Jackson for a gun at the barbeque. Jackson said if he had a "throw away gun," he would give it to the defendant, but he did not have any he could "throw away." It was only after the defendant had picked the other men up and they were on the way to the victim's house and getting ready to park that the plan was modified for the defendant not to enter. The defendant said:
Alright so we had gone over there and I passed down the street and the plan was for everybody I was gonna go park and everybody was gonna walk back down there but they didn't want me to go in cause I was like you know there's some you know you gotta be prepared for the unexpected just incase [sic] somebody is there or somebody, the left somebody in their house you know what if they come at you with something, so you gotta you prepare to have your mindset to try to kill em, you know or defend yourself, or make it to where you know they can't identify you know [sic] more.
At trial, the defendant admitted that he discussed obtaining a gun with Danny, but said he made that statement earlier in the barbeque. Defendant also claimed at trial that he did not know anyone had a weapon before they entered. However, the defendant's statement contradicts his testimony. When asked by the police whether anyone had a gun when the defendant "dropped them off," the defendant replied that "Luther did." The defendant stated that Luther told him that he had the gun for protection. The defendant said that Luther had "gone off" what the defendant had said regarding needing to be prepared for the unexpected.
At trial, the defendant characterized his statement to mean that he saw Luther with a gun when the defendant dropped *1149 Luther off after the shooting. However, the defendant's statement reflects that the only time he dropped off the three men at one time was at the crime scene. After the shooting, he brought Luther, Derrick, and Brian home separately. Thus, context of the question and answer in the defendant's statement allowed the jury to infer that the defendant meant he saw the gun when dropping the three men at the crime scene, not after the crime.
In State v. Hill, supra, 742 So.2d at 696-697, this Court upheld the defendant's second degree murder conviction, even though the trial testimony indicated the defendant was probably not the shooter. This Court pointed out that the defendant was at the murder scene with knowledge that his co-defendant planned to rob the victim; that the defendant did nothing to prevent the crime; and that the defendant fled the scene instead of coming to the victim's aid after the shooting.
In the instant case, the defendant dropped the co-defendants off at the crime scene, knowing that one of them was armed; did nothing to prevent the crime; drove himself and the co-defendants from the scene instead of rendering assistance after the victim was shot, despite knowing that the victim was still alive when the co-defendants left; and failed to report the shooting.
The credibility of the witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness; therefore, the credibility of witnesses will not be reweighed on appeal. State v. Rowan, 97-21 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. After carefully reviewing the record and viewing the evidence in the light most favorable to the prosecution, we find the evidence was sufficient to support the defendant's second degree murder conviction.
Accordingly, this assignment of error is without merit.
The defendant also contends that the trial judge should have quashed the arrest warrant in this case because the affidavit omitted material facts necessary for the magistrate to make an intelligent determination of probable cause. The defendant further contends that the defective warrant made his arrest unlawful and that his subsequent statement should be suppressed as the product of an illegal arrest.
Specifically, the defendant contends that the affidavit did not contain these facts: (1) that Danny Jackson denied any knowledge of the murder on several occasions and; (2) that Jackson implicated Morris and Luther McFarland, Brian Fullilove, and Derrick Williams only after being questioned by the police for 8 ½ hours following an unrelated arrest for drugs and felon in possession of a firearm. Notably, the defendant does not contend that he was arrested without probable cause. The State responds that the trial judge did not abuse his discretion in denying the motion because the arrest warrant was valid.
The record reflects that the defendant did not file a motion to quash his arrest warrant, but rather relied on Brian Fullilove's motion to quash. As background to this assignment, the record reflects that the cases of Brian Fullilove, Derrick Williams and Luther, Morris, and Yarnell McFarland were severed on January 20, 2005. Nevertheless, several motions pertaining to all of these defendants were heard that day. Specifically, the record reflects that the trial judge heard and denied a motion to suppress Fullilove's statement; motions to suppress Luther McFarland's statement and identification; and a motion to suppress Morris McFarland's statement.
The trial judge then took up Fullilove's motion to quash his arrest warrant. During *1150 questioning, Sergeant Meunier testified that, he had interviewed Yarnell and Danny Jackson on several occasions since the murder and that they had consistently denied knowledge of the murder. On August 3, 2004, he interviewed them after they were arrested on drug charges. Initially, both of them denied knowledge of the homicide, but they ultimately revealed information about the homicide. Jackson, who was facing charges of felon with a firearm and possession with intent to distribute marijuana and cocaine, asked Sergeant Meunier what benefits he would receive if he provided information regarding the homicide. Jackson was in custody from 8:30 p.m., and made his taped statement at 5:57 a.m.
Sergeant Meunier obtained an arrest warrant for Fullilove on August 6, 2004, after completing an affidavit and presenting it to the magistrate. The warrant and affidavit were introduced into evidence.
After Fullilove and the State rested, Luther and Morris McFarland moved to adopt Fullilove's motion. Fullilove then argued the warrant was deficient because it did not include Yarnell and Jackson's criminal records; the fact that they resisted making statements several times; and the fact that Jackson did not make a statement until trying to negotiate a deal with the police. The McFarlands then moved to adopt Fullilove's argument. The trial judge ruled the warrant was not defective as follows:
THE COURT:
All right. This was an arrest made with a warrant. Based on what is stated in the warrant, I don't think any of the claims of missing information would have, should have made a difference.
Furthermore, under most circumstances, the officer could have actually, if he had probable cause, made the arrest himself without a warrant for arrest. Under the Code, he was free to do that. He chose to take it to a magistrate, to Judge Sullivan in this case. Judge Sullivan accessed [sic] it. The witness, the detective, as the affiant in this case, testified that he believes what he was told. I see nothing unconstitutional about it.
These motions to suppress evidence as fruit of a poisonous tree, namely a defective warrant are denied. I don't find the warrant defective.
LSA-C.Cr.P. art. 202 provides for issuing an arrest warrant as follows:
Art. 202. Warrant of arrest; issuance
A. A warrant of arrest may be issued by any magistrate pursuant to this Paragraph or as provided in Paragraph D of this Article and, except where a summons is issued under Article 209, shall be issued when:
(1) The person making the complaint executes an affidavit specifying, to his best knowledge and belief, the nature, date, and place of the offense, and the name and surname of the offender if known, and of the person injured if there be any; and
(2) The magistrate has probable cause to believe that an offense was committed and that the person against whom the complaint was made committed it.
. . . .
The arrest warrant affidavit need only specify the nature, date and place of the offense along with the name of the offender. See, State v. Cook, 404 So.2d 1210, 1212 (La.1981). The issuance of an arrest warrant, unlike a search warrant, is valid if the magistrate has within his knowledge sufficient facts to establish probable cause for the arrest. See, State v. Cook, supra, citing State v. Haynie, 395 So.2d 669 (La.1981). Consequently, when a reviewing court is confronted with an arrest warrant based upon a confusing *1151 or constitutionally inadequate affidavit, the matter will be remanded for additional information regarding the facts within the magistrate's possession. State v. Cook, supra.
In State v. McCartney, 96-58 (La.App. 3 Cir. 10/9/96), 684 So.2d 416, 421-423, writ denied, 97-0508 (La.9/5/97), 700 So.2d 503, the court held that the affidavit was sufficient to issue an arrest warrant regardless of the magistrate's lack of knowledge of the contradictory statement where the witness initially denied knowledge of the crime. In McCartney, the defendant argued that the arrest warrant should have been suppressed because the warrant was based on the statement of the co-defendant's wife and the police did not disclose all contradictory and conflicting testimony given by this witness to the magistrate. The McCartney court reviewed the warrant and affidavit, which had been admitted at the suppression hearing, and concluded that the contradictory statement, when considered with the facts included in the affidavit, did not negate the existence of probable cause for defendant's arrest. Id. at 422. The McCartney court noted that "[i]t is not uncommon for many individuals to deny guilty knowledge when first questioned by authorities." Id.
Unlike McCartney, this Court cannot review the affidavit because the defendant did not introduce it.
According to LSA-C.Cr.P. art. 703(D), the defendant generally has the burden of proving the grounds of a motion to suppress:
On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.
In State v. Williams, 01-0732 (La.11/28/01), 800 So.2d 819, 827, cert. denied, 537 U.S. 1203, 123 S.Ct. 1275, 154 L.Ed.2d 1045 (2003), the Louisiana Supreme Court held the defendant failed to meet his burden of proving the grounds of his motion to suppress evidence because the evidence was seized pursuant to a warrant. An affidavit supporting a search warrant is presumed to be valid and the defendant has the burden of proving that the representations in the affidavit are false. State v. Singleton, 98-387 (La.App. 5 Cir. 10/28/98), 723 So.2d 484, 488, writ denied, 99-0101 (La.5/7/99), 741 So.2d 30.
Applying the foregoing principles, the affidavit accompanying the arrest warrant was presumed valid and that the defendant had the burden to prove the grounds of a motion to quash the arrest warrant. We fail to find that the defendant met his burden of proof in this case because the defendant did not introduce any evidence  testimonial or otherwise  at the hearing. Rather, defendant apparently moved to adopt Fullilove's motion based on the assumption that Fullilove's affidavit was identical to the defendant's affidavit. However, there is no proof that the affidavits were identical. Moreover, the defendant did not question Sergeant Meunier regarding the affidavit or what he told the magistrate when securing the warrant in the defendant's case. Rather, the testimony at the hearing, as well as the warrant and accompanying affidavit introduced at the hearing, pertained to Brian Fullilove.[6]
The defendant acknowledges in his brief that the affidavit is not contained in the record nor mentioned in the proceedings. However, the defendant asserts that the affidavit is the "same affidavit as in the co-defendant's case and was in the *1152 severed co-defendant's record." There is nothing in the record to support this assertion. A trial judge is afforded great discretion when ruling on a motion to suppress, and his ruling will not be disturbed absent an abuse of that discretion. State v. Haywood, 00-1584 (La.App. 5 Cir. 3/28/01), 783 So.2d 568, 574. Because we find the defendant failed to meet his burden of proving the allegations of the motion to quash the arrest warrant, we conclude that there is insufficient basis to disturb the trial judge's ruling.
ERROR PATENT DISCUSSION
The Defendant requests an error patent review. However, this Court routinely reviews the record for errors patent in accordance with LSA-C.Cr.P.art. 920; State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir. 1990) regardless of whether defendant makes such a request. After a review of the record, we find no error which requires corrective action by this Court.
Accordingly, defendant's conviction and sentence are affirmed.
AFFIRMED.
NOTES
[1] Luther McFarland's case is a companion appeal, No. 06-KA-970, also set on current docket.
[2] The indictment was subsequently amended to charge Fullilove with manslaughter.
[3] The record reflects that the victim was also known as "C.J."
[4] It is unclear from Mr. Buras' testimony whether he saw three or four men that night.
[5] See also, State v. Anderson, 97-1301 (La.2/6/98), 707 So.2d 1223, 1224, ("Acting in concert, each man then became responsible not only for his own acts but for the acts of the other.").
[6] It is noted that the State introduced the arrest warrant, but not the affidavit, at trial.