GARRETT, J.
The defendant, Amanda Williams, was convicted by a unanimous jury of the second degree murder of Bryan Savage. Williams was ordered to serve the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. On appeal, she claims the evidence was insufficient to support the conviction. For the following reasons, we affirm the conviction and sentence.
FACTS
The victim in this murder case was Bryan Savage. Williams had previously been employed by Elite Services as a sitter and sat with Savage's elderly father at Savage's home on Woolworth Road in Shreveport. In the early morning hours of February 22, 2016, firefighters responded to a fire at the home. When they entered the house, they found Savage's dead body lying face up in the living room. He had a gunshot wound to the chest. He also had wounds on his head and his body was partially burned. A garden tool was found near the body.
It was determined that Williams and an accomplice, Cameron Lewis, broke into the house; killed Savage; took numerous items from the residence, including two safes; stole Savage's Ford F250 work truck; and set fire to the house.[1] On April 14, 2016, Williams was charged by grand jury indictment with the second degree murder of Savage.[2] On March 8, 2018, Williams was convicted as charged by a unanimous jury.
Williams filed motions for post verdict judgment of acquittal and new trial, asserting that the evidence presented was insufficient to support her conviction and that the verdict was contrary to the law and evidence. The motions were denied and she was sentenced to serve the mandatory sentence of life imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence. A motion to reconsider her sentence was denied. Williams appealed her conviction.
*488 SUFFICIENCY OF THE EVIDENCE
On appeal, Williams argues that the evidence is insufficient to support her conviction of second degree murder as a result of an aggravated burglary and the death of the victim. While she admits committing a burglary, she claims that she did not commit an aggravated burglary because she was not the person who had the weapon that killed the victim. She asserts that she was not aware that Lewis had a gun and she did not know or intend for anything to occur, other than a burglary. These arguments are without merit.
Legal Principles
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Brooks , 49,024 (La. App. 2 Cir. 5/14/14), 139 So.3d 1072, writ denied , 2014-1202 (La. 2/13/15), 159 So.3d 459.
This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 2005-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Brooks , supra .
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442 ; State v. Brooks , supra . A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Brooks , supra .
La. R.S. 14:30.1 defines second degree murder, in part, as follows:
Second degree murder is the killing of a human being:
...
(2) When the offender is engaged in the perpetration or attempted perpetration of ... aggravated burglary, ... even though he has no intent to kill or to inflict great bodily harm.
La. R.S. 14:60 defines aggravated burglary as follows:
A. Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, under any of the following circumstances:
(1) If the offender is armed with a dangerous weapon.
(2) If, after entering, the offender arms himself with a dangerous weapon.
(3) If the offender commits a battery upon any person while in such place, or in entering or leaving such place.
La. R.S. 14:67 defines theft as follows:
Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
The parties to crimes are classified as: (1) principals, and (2) accessories after the fact. La. R.S. 14:23. The law of principals, as set forth in La. R.S. 14:24, states that:
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet *489 in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.
The defendant's mere presence at the scene is not enough to "concern" an individual in the crime. State v. Hampton, 98-0331 (La. 4/23/99), 750 So.2d 867, cert. denied , 528 U.S. 1007, 120 S.Ct. 504, 145 L.Ed.2d 390 (1999) ; State v. Schwander , 345 So.2d 1173 (La. 1977). Nor can a jury's inference that an accused aided and abetted in a crime be founded upon mere speculation based upon guilt by association. State v. Schwander , supra. Only those persons who knowingly participate in the planning or execution of the crime are principals. State v. Pierre , 631 So.2d 427 (La. 1994). An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. State v. Lewis , 46,513 (La. App. 2 Cir. 9/28/11), 74 So.3d 254, writ denied , 2011-2317 (La. 3/9/12), 84 So.3d 551.
There is a general principle of accessorial liability that when two or more persons embark on a concerted course of action, each person becomes responsible for not only his own acts, but also for the acts of the other, including deviations from the common plan which are the foreseeable consequences of carrying out the plan. State v. Smith , 2007-2028 (La. 10/20/09), 23 So.3d 291 ; State v. Anderson , 97-1301 (La. 2/6/98), 707 So.2d 1223.
While possession of a dangerous weapon is an essential component of the commission of the aggravated burglary, a person may be a principal to the offense even though he did not personally have possession of the weapon used in the commission of the crime. State v. McFarland , 07-26 (La. App. 5 Cir. 5/29/07), 960 So.2d 1142, writ denied , 2007-1463 (La. 1/7/08), 973 So.2d 731. The rule has particular application in cases of felony murder. Thus, a simple burglary may turn into an aggravated burglary and then escalate further into a second degree felony murder well beyond the original plan of the defendant or his accomplice who then unexpectedly kills during commission of the underlying felony offense. State v. Smith , supra.
In State v. McFarland , supra , the fifth circuit affirmed a conviction for second degree felony murder in the course of an aggravated burglary, finding that the fact that the defendant claimed he did not know the co-perpetrator was armed did not absolve him from responsibility, as the risk that the unauthorized entry of an inhabited dwelling may escalate into violence and death is a foreseeable consequence of burglary which every party to the offense must accept no matter what he or she actually intended. One need not possess specific intent to kill or inflict great bodily harm to be a principal to a second degree felony murder. State v. McFarland , supra . Under the law of principals, a person may be convicted of an offense even if he has not personally fired the fatal shot. State v. Hampton , supra ; State v. Lewis , supra ; State v. Brooks , supra.
Discussion
A review of the record shows that the evidence was more than sufficient to support Williams's conviction for second degree murder. The evidence clearly shows that Williams was a willing participant and actively involved in the planning, execution, and aftermath of this horrific murder.
At trial, Eric Mayes of the Caddo Parish Sheriff's Office testified that, at approximately 5:45 a.m. on the morning of February 22, 2016, he responded to a call about a suspicious vehicle parked near a house on Woolworth Road in Shreveport. Deputy Mayes pulled up behind a white Chevrolet *490 Avalanche, which started to pull away. Deputy Mayes executed a traffic stop to determine if there was a problem. The driver of the vehicle, Lewis, indicated that he was having trouble with the vehicle. Lewis produced a Louisiana identification card, not a driver's license, and the vehicle registration, showing it was registered to Jerry Compton, who was later determined to be Williams's grandfather. According to Deputy Mayes, Lewis was sweaty and behaving suspiciously. Lewis did not have proof of insurance. He called a female to determine where the proof of insurance was located. When the search for the document proved futile, Deputy Mayes asked Lewis to step out of the vehicle. Lewis rapidly drove away, leaving his identification card and registration with Deputy Mayes. A chase ensued. According to Deputy Mayes, Lewis was driving in excess of 100 mph on wet roads. At that point, Deputy Mayes had no indication that Lewis had committed a felony. He was instructed by his supervisor to end the pursuit and to get a warrant for Lewis's arrest.
Robert Smith with the Shreveport Fire Department testified that on February 22, 2016, at 5:45 a.m., he was dispatched to a fire at a two-story log cabin on Woolworth Road.[3] The call was received as a fire alarm, but when firefighters arrived the house was on fire. The attached garage appeared to be "pretty much involved." The firefighters decided to enter the house and try to push the fire back toward the garage and save the house. They kicked in the front door and noticed a body lying on the floor. According to Smith, there was a puncture wound to the chest and the person appeared to have been dead for some time. A three-pronged garden tool was lying on the floor near the feet of the body.
John Phelan, a videographer with the Caddo Parish Sheriff's Office, testified that, on the morning of this incident, he saw the fire and went to the Woolworth Road location. He used a drone to video the fire in progress. The footage was admitted into evidence and shown to the jury.
Josh McCollum, an arson investigator with the Shreveport Fire Department, testified that he investigated this fire. He took numerous photographs at the scene which were introduced into evidence. A sliding glass door on the house was broken and it was determined that the fire department did not break the door. A bottle of charcoal lighter fluid was found near the victim's body. A Ford Explorer belonging to the victim was parked in the driveway and had radiant heat damage. McCollum took samples of carpet from various places in the house, including near the victim's body, to be tested for accelerants.
Bruce Stentz with the North Louisiana Crime Laboratory testified that he analyzed the samples submitted by the fire department and some of them contained accelerants. The samples taken near the body contained the highest concentration of accelerants.
David Bonillas of the Shreveport Police Department Violent Crimes/ Homicide Unit was the lead investigator. He arrived on the scene while the fire department was still present. He noted damage to the sliding glass door and observed a wound to the upper chest of the victim. He was advised of Deputy Mayes's encounter with Lewis in the Avalanche registered to Compton. According to Bonillas, Compton is Williams's grandfather, who adopted her. Law enforcement officers were advised to be on the lookout for the Avalanche. It was learned that Williams had *491 been employed with Elite Services as a sitter and sat at Savage's home for several weeks in November and December 2015.
During the course of the investigation, surveillance video was obtained from Sam's Town Casino parking garage and shown to the jury. On the date of this offense, at 6:53 a.m., approximately one hour after Lewis's traffic stop at the scene of the crime, the Avalanche and Savage's work truck pulled into the parking garage. Lewis and Williams were driving the vehicles. The pair got out; Lewis left in the work truck and Williams left in the Avalanche. They returned to the parking garage shortly after noon. Williams was still driving the Avalanche, but Lewis was driving a green Honda Accord. They parked side by side and exited their vehicles. Williams was seen in the passenger side of the Accord going through items. Lewis was touching a safe in the back seat of the Accord. Two safes were taken from Savage's home. Williams and Lewis were in the garage for approximately two hours. Lewis left in the Accord at 2:39 p.m. and Williams left in the Avalanche at 2:42 p.m.
Jason Saiz of the Shreveport Police Department testified that, on the evening of February 22, 2016, when he reported for work around 11:00 p.m., there was talk about the fire. Around 1:00 a.m. on February 23, 2016, he got a call from a homicide detective to be on the lookout for a white Chevrolet Avalanche that might have been involved in this homicide and fire. He located the vehicle at the Merryton Inn on Monkhouse Drive. It was determined that Cameron Lewis had rented a room at the motel and another room was registered to Lewis's wife, Sanchasity Lewis. Saiz called in the Special Response Team, which made entry and apprehended Williams, Lewis, and Lewis's wife.
Betsy Huey Pickett, a crime scene investigator with the Shreveport Police Department, made photographs of the Savage home. She said the house was in disarray with all kinds of papers on the floor, drawers and cabinets opened up, and dresser drawers emptied. An expended cartridge casing was retrieved. The body had not yet been removed and, while she was processing the scene, part of the ceiling caved in near the body. Pickett testified that Savage's wallet was found in the Explorer at the house. The vehicle was damaged by the fire.
It was determined that Savage had a Ford F250 work truck that was missing from the house. Later in the day, patrol officers located the abandoned truck at Ford Park in Shreveport. Pickett made photographs of the truck.
She also made photographs of things found in the motel room where Williams and Lewis were apprehended. These included a sock containing foreign currency, as well as some commemorative coins. She photographed the Avalanche and a green Honda Accord belonging to Lewis's wife. Both vehicles were retrieved from the Merryton Inn and were impounded. A live round was found in the Accord, as well as the keys to Savage's work truck and a black bag containing medicine bottles with Savage's name on them.
Dr. Long Jin, the forensic pathologist who performed the autopsy on Savage, testified that Savage had a gunshot wound to the upper chest with an exit wound on the back. The bullet perforated the aorta and Savage died from massive internal bleeding. The body also sustained blunt force injuries. There was a laceration on the temple around the right eye, a fracture at the right orbital plate, and a fracture at the base of the skull with intracranial hemorrhage in the brain. Small cuts were also found on the victim's hands. Dr. Jin stated that someone struck the victim in the head before he died. Dr. Jin did not detect any *492 smoke in the victim's trachea. There were first and second degree burns on 20% of the body, which occurred postmortem.
On cross-examination, Dr. Jin said that Savage had severe lung disease, heart disease, and severe coronary artery disease. He had hypertension that had caused changes to the kidneys. Although Savage was "not in good shape," Dr. Jin said that what killed him "was being shot in the chest."
Williams and Lewis were arrested on February 23, 2016. On February 29, 2016, Williams asked to speak to officers about the offense. After she was informed of and waived her Miranda rights, Williams was interviewed by Bonillas and Detective Johnny Elie on March 3, 2016. The recording of the interview was admitted into evidence and was played for the jury.[4]
In her statement, Williams said that she had worked as a sitter at Savage's house and was familiar with the layout. Williams and Lewis went to Savage's home to take two safes they knew were in the house. They traveled to the house in her grandfather's Avalanche and arrived at approximately 3:00 a.m. They parked the Avalanche on the side of the road and found a hole in the fence around the house to gain entrance to the property. They expected that Savage would be at home; she looked in a window and determined that Savage was either asleep or watching television. Williams said Lewis planned to knock Savage out if necessary. She admitted that they knew they might have to harm Savage if they had to knock him out.
They entered a garage apartment, thinking that the garage door would be open. She knew that Lewis had a loaded rifle. Lewis broke through the glass door with the butt of the gun to gain entrance to the house. Williams originally claimed she was outside when she heard a gunshot. She later said that she heard Lewis make a grunting sound and then heard the gunshot. She said she checked a bedroom to see if Savage's father was in the house. He was not.
According to Williams, Lewis said he shot Savage in the throat to shut him up. Williams said she did not know where the garden tool came from. At first, she said that when Lewis told her Savage was dead, she went to Savage's Ford Explorer and sat there while Lewis continued to take things. She later said that they both continued to take jewelry, guns, televisions, and the two safes in the closet. They were in the house for an extended period of time after shooting Savage. They loaded the items from the burglary into Savage's Explorer, but then discovered that the vehicle would not start. They transferred the items into Savage's work truck. Lewis showed Williams a projectile and they wondered whether it was the bullet used to kill Savage.
Williams said that Lewis emptied numerous liquor bottles and some charcoal lighter fluid in the house in order to start the fire. She said they spent 45 minutes to an hour trying to start the fire. Williams left the scene in the work truck, loaded with the goods from the burglary. Lewis was driving the Avalanche that was briefly detained by Deputy Mayes.
After Lewis eluded Deputy Mayes, Williams and Lewis met in Texas to exchange vehicles. They drove back to Louisiana and Williams briefly went to Diamond Jack's Casino. She then met Lewis at Sam's Town Casino to give Lewis the keys to his wife's green Honda Accord. She went home to get her children off to *493 school. She met Lewis at Sam's Town later that day and he was driving the Accord.
Williams agreed to return to the house and do a walk-through with law enforcement officers, which was recorded and played for the jury. During the walk-through, Williams again recounted that the plan was to burglarize the house and knock Savage out if necessary. She said they knew that Savage's father might be present and they might have to tie them both up. She admitted that she and Lewis knew there was a possibility they would have to use force to accomplish the burglary.
She said that Lewis entered through a window and opened a door for her. They took some tools and after Savage was shot, Williams said she got the safes and put them in the victim's Explorer. She said Lewis pulled out drawers and took televisions, a laptop computer, and went through paperwork looking for cash. She said she was going through jewelry boxes when Lewis came to her with the projectile they thought might have killed Savage. Lewis put it in his pocket. Williams said that, prior to the burglary, she saw Lewis load the gun and that it had small bullets. She said they spent an hour in the house after Savage was killed.
Williams claimed that she was outside "in the truck" when Lewis set the fire. She said she saw Lewis get pulled over. They talked on the phone during that stop and she heard him speed away. Williams said that she was trained in CPR, but she did not use those skills to try to help Savage.
The testimony and evidence presented at trial, particularly with statements made by Williams herself, show there was ample evidence to convict her of the second degree murder of Savage, which occurred during the commission of an aggravated burglary. In her appellate brief, Williams contends that she did not intend to commit aggravated burglary, only a simple burglary, and that she did not know that Lewis had a gun. The evidence adduced at trial clearly shows otherwise. Williams's statements to the police described in great detail the manner in which she and Lewis planned the burglary. They expected Savage to be present and anticipated using force against him. She said Lewis planned to knock Savage out, if necessary, and tie him up. They also anticipated restraining Savage's elderly father, if he had been present. Williams stated that she knew they might have to harm Savage to accomplish the burglary.
Williams also said she knew that Lewis had a rifle, she watched him load it at a motel prior to the burglary, she saw him carrying the gun as they broke into the house, and that he used the butt of the gun to break a sliding glass door to gain entry into the dwelling.
The evidence shows that Williams intended to commit the unauthorized entry of Savage's inhabited dwelling with the intent to commit a theft therein. Williams and Lewis entered Savage's home, took numerous items, and stole a truck. Williams knew Lewis was armed with a dangerous weapon and, while Williams and Lewis were in the dwelling, Savage was struck in the head, and then shot and killed. To be a principal to second degree murder in this case, it was not necessary that Williams personally possess the weapon or fire the shot that killed Savage. All of the elements necessary to prove that Williams committed the second degree murder of Savage while engaged in the perpetration of an aggravated burglary were proven beyond a reasonable doubt. Her claims that the evidence was insufficient to support her conviction are unfounded, unsupported by the evidence, and without merit.[5]
*494 CONCLUSION
For the reasons stated above, we affirm the conviction and sentence of the defendant, Amanda Williams, for second degree murder.
AFFIRMED.

Lewis was also convicted of second degree murder in this matter. His conviction was affirmed on appeal. See State v. Lewis, 52,289 (La. App. 2 Cir. 9/26/18), 256 So.3d 510.

The indictment charging Williams with second degree murder did not specify whether she was charged with specific intent under La. R.S. 14:30.1(A) and/or felony murder under La. R.S. 14:30.1(A)(2). However, the jury was instructed that Williams was charged with the second degree murder of Savage while engaged in the commission or attempted commission of an aggravated burglary.

This was approximately the same time that Deputy Mayes stopped the Avalanche driven by Lewis. On the traffic stop video, sirens can be heard.

A hearing was held by the trial court on August 29, 2017. The statements given by Williams were found to have been made freely and voluntarily and were admissible at trial.

We also observe that, in State v. Lewis , 256 So.3d at 516, Williams's accomplice stated that Williams was armed with a pistol and it was Williams who fired the shot that ended Savage's life. While it cannot be determined which of the two perpetrators fired the fatal shot, as explained above, proof of that fact is not necessary. This record contains ample evidence to support Williams's conviction for second degree murder.