PITMAN, J.
*514 A jury convicted Defendant Cameron Lewis of second degree murder. The trial court sentenced him to the mandatory sentence of life imprisonment at hard labor without benefit of parole, probation or suspension of sentence. For the following reasons, we affirm Defendant's conviction and sentence.
FACTS
On April 14, 2016, a grand jury charged Defendant by indictment with second degree murder in violation of La. R.S. 14:30.1, alleging that on February 22, 2016, he murdered Bryan Savage.
On November 3, 2016, Defendant filed a motion to suppress recorded and unrecorded statements he gave to law enforcement officers on the grounds that they were not freely and voluntarily given, that the officers did not fully and adequately advise him of his constitutional rights and that they were made as a result of improper promises and inducements. On June 22, 2017, the trial court conducted a free and voluntary hearing, finding that Defendant's statements were freely and voluntarily made after he was advised of his rights, and denied the motion to suppress statements.
Also on November 3, 2016, Defendant filed a motion to suppress evidence. He sought to suppress items seized from a Honda Accord, which belonged to his wife Sanchasity Lewis, on the grounds that law enforcement officers did not have consent to search, the items were not in plain view, the search was not incident to an arrest and no exigent circumstances existed. Defendant argued that the subsequent search warrant was defective because it was secured after the search had begun; and, therefore, any evidence seized pursuant to the warrant should have been excluded. A hearing on the motion to suppress was held on November 14, 2017. On January 10, 2018, the trial court denied the motion to suppress.[1]
A jury trial began on January 8, 2018. Cpl. Eric Mayes of the Caddo Parish Sheriff's Office testified that between 5:30 and 6:00 a.m. in the morning on February 22, 2016, he responded to a call about a suspicious vehicle on Woolworth Road. He drove up to a white Chevy Avalanche, which was parked on the side of Woolworth Road. The driver of the Avalanche drove away, and he followed and initiated a traffic stop. He approached the driver, whom he identified in court as Defendant. Defendant advised that he was parked on the side of the road because he was having a problem with his vehicle. Cpl. Mayes requested Defendant's driver's license, proof of insurance and proof of registration. Defendant produced his State of Louisiana identification card and a proof of registration and then searched the Avalanche for his proof of insurance. At this time, Cpl. Mayes heard sirens and observed fire vehicles driving on Woolworth Road. His partner then arrived at the scene of the traffic stop, and Cpl. Mayes asked Defendant to exit his vehicle. While Cpl. Mayes spoke with his partner, Defendant drove away. Cpl. Mayes and his partner engaged in a high-speed pursuit of Defendant's vehicle but called off the pursuit when Defendant's vehicle was no longer in sight. The traffic stop and Defendant's flight were recorded by the camera in Cpl. Mayes's vehicle, and video of this recording was introduced into evidence and played for the jury. Cpl. Mayes testified *515 that he was then informed of a fire at the house on Woolworth Road where he had responded to the call about the suspicious vehicle. He reported to the house and learned that there was a deceased person inside. He noted that the middle portion of the house had collapsed on itself, that there was fire and water damage on the inside of the house and that the deceased was lying on the floor of the living room.
Officer Brian Michael of the Shreveport Police Department testified that on the evening of February 22, 2016, he came upon an abandoned white Ford truck at a park. He discovered that the truck was a stolen vehicle and was involved in a homicide investigation. He obtained a search warrant for the truck and remained with it until the crime scene unit arrived.
Officer Jason Saiz of the Shreveport Police Department testified that at approximately 1:00 a.m. on February 23, 2016, he received a message from dispatchers that suspects in a homicide were possibly at a hotel in the Shreveport area and were driving a white Avalanche. He discovered a white Avalanche parked at the Merryton Inn. Officers determined that the VIN matched that of the Avalanche involved in the homicide investigation.
Detective Marlon Clark of the Shreveport Police Department testified that on February 23, 2016, he responded to the Merryton Inn. He stated that Defendant, Amanda Williams[2] and Sanchasity Lewis had been taken into custody and that officers searched the hotel rooms they had occupied. Under the mattress in Amanda's room, officers found a sock containing foreign and commemorative coins. In Defendant and Sanchasity's room, officers found a key to a Honda vehicle. Det. Clark located a green Honda Accord in the parking lot of the hotel, determined that the key worked for that vehicle and impounded it. He noted that Defendant and Sanchasity were married and owned the Accord. Det. Clark testified that he went to the impound yard at the crime lab to investigate the Accord and a white Ford F250, which was the victim's work truck. Sanchasity gave written consent for a search of the Accord. Within its driver's side door, officers found a key to the F250. Also within the Accord, officers found a bag with bottles of medication with the victim's name on them, a wallet and a small caliber bullet.
Det. David Bonillas of the Shreveport Police Department testified that he was the primary investigator in this homicide case. He described the condition of Mr. Savage's body at the scene and noted that he was wearing only his underwear and a gold chain, he had blood coming from his nose and he had a wound to his upper chest area. He described what he observed at the house, noting the fire damage and that it appeared someone had gone through all of Mr. Savage's belongings and strewn paperwork everywhere. He testified that members of Mr. Savage's family advised that a television, two safes and various firearms were missing from the house and that Mr. Savage's F250 was also missing. They informed him that a woman named Bailey or Amanda was a home sitter for Mr. Savage. During Det. Bonillas's testimony, security footage from Sam's Town Casino recorded on February 22, 2016, was introduced into evidence and viewed by the jury. The video and photographs showed Defendant and Amanda arriving at and departing from the parking garage at different times in the Avalanche, the Accord and the F250.
*516 Det. Bonillas also testified that he interviewed Defendant at the police station on the morning of February 23, 2016, several hours after his arrest. Defendant denied any involvement in the homicide and stated that Lee Lewis was responsible. He also interviewed Amanda, and she stated that she did not know Lee Lewis. Based on these inconsistent statements, he interviewed Defendant on February 24, 2016. An audio and video recording of this interview was played for the jury. During the interview, Defendant at first denied involvement, but he then admitted to being inside the house and repeatedly stated that he did not kill Mr. Savage. He explained that Amanda was a sitter for Mr. Savage and knew that the house would be "an easy lick." He and Amanda entered the house and went separate ways-he stole two televisions, and she took coins and prescription medication. He stated that Amanda shot Mr. Savage with the .22 or .25 caliber pistol she had when they entered the house. Defendant admitted to setting the fire with lighter fluid to "cover [their] tracks."
Following the interview at the police station, Det. Bonillas drove Defendant to the crime scene, and they walked through the house. This was recorded, and the video was played for the jury. In the video, Defendant detailed how he and Amanda broke into the house and went to different areas of the house. Defendant heard Mr. Savage "holler" and heard a "pop." He then saw Mr. Savage lying on his back on the floor, and he was breathing and moaning and looking at Defendant. Defendant then found lighter fluid and started a fire using his lighter. Defendant removed two televisions from the house and put them in the Avalanche. Defendant saw Amanda with a gun when they arrived at the house and noted that it was an automatic.
On cross-examination, Det. Bonillas testified that Amanda was also charged with second degree murder. He noted that she was a suspect in a previous burglary of Mr. Savage's house. He stated that in November and December 2015, Amanda was a sitter for Mr. Savage's father, who lived with Mr. Savage.
Corporal Betsy Huey Pickett of the Shreveport Police Department testified that she investigated the crime scene. She described the condition of the house and how fire damage, including the ceiling collapsing, impacted the investigation. She stated that it appeared that someone had ransacked the house and that items were strewn about.
Corporal Jennifer White of the Shreveport Police Department testified that she investigated the crime scene and recovered a spent cartridge casing, which appeared to be .22 in caliber.
Joshua McCollum, an arson investigator with the Shreveport Fire Department, testified that he investigated the house on Woolworth Road, which included taking photographs and collecting samples of debris.
Bruce Stentz, a forensic chemist with the North Louisiana Crime Lab, testified that he analyzed four samples collected at the scene. He found ignitable liquids on two of the samples.
Dr. Long Jin, an expert in the field of forensic pathology, testified that he performed the autopsy on Mr. Savage. He determined the manner of death to be homicide and the cause of death to be a single perforating gunshot wound to the left chest. He noted that the bullet penetrated Mr. Savage's aorta, which caused significant blood loss. He testified that Mr. Savage likely lived "several minutes" after being shot. He opined that Mr. Savage expired prior to the fire. He stated that he *517 did not observe any smoke in Mr. Savage's airway, and the toxicology reports did not show any carbon monoxide. He observed burns on 15 to 20 percent of Mr. Savage's body surface.
On January 10, 2018, a unanimous jury convicted Defendant as charged of second degree murder.
On January 24, 2018, Defendant filed a motion for new trial. He argued that the trial court erred in denying his motions to suppress, that it erred in including in the jury instructions any reference to the offense of aggravated arson and that the verdict is contrary to the law and evidence. He also filed a motion for post-verdict judgment of acquittal. In the alternative, he argued that he should be convicted of the lesser included offense of manslaughter. These motions were addressed at a hearing on January 24, 2018, and the trial court denied the motions. Defendant waived sentencing delays, and the trial court sentenced him to the statutory mandatory sentence of life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence.
Defendant appeals.
DISCUSSION
Sufficiency of the Evidence
Defendant argues that the evidence adduced at trial was insufficient to find him guilty of second degree murder beyond a reasonable doubt. He contends that, at most, he is guilty of manslaughter. He further asserts that there was insufficient evidence to prove that he was a principal to aggravated arson or aggravated burglary; thus, he could not be convicted of felony murder. He notes that Dr. Jin's testimony that Mr. Savage expired before the fire started precludes a conviction for aggravated arson. He submits that the evidence only supports a finding of simple burglary of an inhabited dwelling in that he intended to commit a theft, but did not know Amanda was going to shoot Mr. Savage.
The state argues that the evidence presented at trial was sufficient to prove that Defendant was guilty of second degree murder, specifically of felony murder because it proved the crimes of aggravated arson and aggravated burglary. It notes that Defendant admitted that he used charcoal lighter fluid to start a fire and that Mr. Savage was alive when he set the fire. He also admitted to stealing a television and knowing Amanda was armed with a pistol.
When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence. State v. Hearold , 603 So.2d 731 (La. 1992). The reason for reviewing sufficiency first is that the accused may be entitled to an acquittal under Hudson v. Louisiana , 450 U.S. 40, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981), if a rational trier of fact, viewing the evidence in accordance with Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), in the light most favorable to the prosecution, could not reasonably conclude that all of the essential elements of the offense have been proved beyond a reasonable doubt. State v. Hearold , supra .
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia , supra ; State v. Hearold , supra . See also La. C. Cr. P. art. 821. This standard does not provide an appellate court with a vehicle for substituting its appreciation of the *518 evidence for that of the fact finder. State v. Pigford , 05-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Robertson , 96-1048 (La. 10/4/96), 680 So.2d 1165.
The trier of fact makes credibility determinations and may accept or reject the testimony of any witness. State v. Casey , 99-0023 (La. 1/26/00), 775 So.2d 1022, cert. denied , 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000). A reviewing court may not impinge on the fact finder's discretion unless it is necessary to guarantee the fundamental due process of law. Id. The appellate court does not assess credibility or reweigh the evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Gilliam , 36,118 (La. App. 2 Cir. 8/30/02), 827 So.2d 508, writ denied , 02-3090 (La. 11/14/03), 858 So.2d 422.
La. R.S. 14:30.1(A)(2) provides, in pertinent part, that second degree murder is the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of an enumerated felony, including aggravated arson or aggravated burglary, even though he has no intent to kill or to inflict great bodily harm.
La. R.S. 14:51(A) defines aggravated arson as the intentional damaging by any explosive substance or the setting fire to any structure, watercraft or movable whereby it is foreseeable that human life might be endangered.
La. R.S. 14:60(A) defines aggravated burglary and states:
A. Aggravated burglary is the unauthorized entering of any inhabited dwelling, or of any structure, water craft, or movable where a person is present, with the intent to commit a felony or any theft therein, under any of the following circumstances:
(1) If the offender is armed with a dangerous weapon.
(2) If, after entering, the offender arms himself with a dangerous weapon.
(3) If the offender commits a battery upon any person while in such place, or in entering or leaving such place.
All persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission or directly or indirectly counsel or procure another to commit the crime, are principals. La. R.S. 14:24. A person who aids and abets another in a crime is liable just as the person who directly commits it, although he may be convicted of a higher or lower degree of the crime, depending upon the mental element proved at trial. State v. Garcia , 44,562 (La. App. 2 Cir. 10/28/09), 26 So.3d 159, writ denied , 09-2583 (La. 2/11/11), 56 So.3d 992, citing State v. Watson , 397 So.2d 1337 (La. 1981). An individual may only be convicted as a principal for those crimes for which he has personally had the requisite mental state, the requisite mental knowledge, the requisite mental intent. State v. Garcia , supra , citing State v. Watson , supra .
Acting in concert, each person becomes responsible not only for his own acts, but for the acts of the other. State v. Anderson , 97-1301 (La. 2/6/98), 707 So.2d 1223 ; State v. Jones , 49,830 (La. App. 2 Cir. 5/20/15), 166 So.3d 406, writ not considered , 15-1524 (La. 3/14/16), 188 So.3d 1067. Under the law of principals, a person may be convicted of an offense even if he has not personally fired the fatal shot. State v. Hampton , 98-0331 (La. 4/23/99), 750 So.2d 867 ; State v. Jones , supra . While possession of a dangerous weapon is an *519 essential component of the commission of an aggravated burglary, a person may be a principal to the offense even though he did not personally have possession of the weapon used in the commission of the crime. State v. Ortiz , 96-1609 (La. 10/21/97), 701 So.2d 922, cert. denied , 524 U.S. 943, 118 S.Ct. 2352, 141 L.Ed.2d 722 (1998).
The evidence presented at trial was sufficient to support a conviction for second degree felony murder based either on the commission of aggravated arson or aggravated burglary.[3]
Mr. Savage was killed when Defendant was engaged in the perpetration or attempted perpetration of aggravated arson. In his interview with Det. Bonillas and while walking through the crime scene with law enforcement officers on February 24, 2016, Defendant admitted to using lighter fluid and his lighter to set a fire at Mr. Savage's house to "cover [his and Amanda's] tracks." It was foreseeable that human life might be endangered because Defendant believed Mr. Savage was alive when he set the fire. Defendant observed Mr. Savage breathing and moaning and looking at him while lying on the floor. Although Dr. Jin opined that Mr. Savage had expired prior to Defendant setting the fire, his opinion does not preclude a conviction for second degree murder based on aggravated arson. Further, Amanda was inside the house when Defendant set the fire, which also put her life in danger.
Mr. Savage was killed when Defendant was engaged as a principal in the perpetration or attempted perpetration of aggravated burglary. Defendant and Amanda made an unauthorized entry into Mr. Savage's house while Mr. Savage was present, and they had the intent to commit a felony or a theft therein, i.e., they intended to take items from Mr. Savage's house. Defendant and Amanda ransacked the house and took a variety of items, including televisions, coins and Mr. Savage's F250. Defendant knew that Amanda was armed with a dangerous weapon, i.e., a .22 or .25 caliber firearm, when they entered the house. While in the house, Amanda committed a battery on Mr. Savage by shooting him. The facts that Defendant did not have possession of the weapon and did not shoot Mr. Savage do not affect his status as a principal to aggravated burglary.
Accordingly, this assignment is without merit.
Motion to Suppress Statements
Defendant argues that the trial court erred in denying his motion to suppress statements. He contends that his statements were not freely and voluntarily given, that he was not fully advised of his constitutional rights and that his statements were the results of improper promises and inducements.
The state argues that law enforcement used well-known tactics when questioning Defendant and that jurisprudence has not condemned these methods as improper under the circumstances of this case.
Before what purports to be a confession can be introduced in evidence, it must be affirmatively shown that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451. The state must also establish that *520 an accused who makes a statement during custodial interrogation was first advised of his rights pursuant to Miranda v. Arizona , 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). State v. Roddy , 33,112 (La. App. 2 Cir. 4/7/00), 756 So.2d 1272, writ denied , 00-1427 (La. 5/11/01), 791 So.2d 1288.
When a defendant alleges specific instances of police misconduct in reference to the statement, it is incumbent upon the state to specifically rebut the allegations. State v. Vessell , 450 So.2d 938 (La. 1984) ; State v. Washington , 51,818 (La. App. 2 Cir. 4/11/18), 245 So.3d 1234.
The admissibility of a confession is in the first instance a question for the trial court. State v. Roddy , supra . The trial court's conclusion on the credibility and weight of testimony relating to the voluntariness of a confession for the purpose of admissibility is entitled to great weight and will not be overturned on appeal unless it is not supported by the evidence. State v. Benoit , 440 So.2d 129 (La. 1983) ; State v. Roddy , supra .
When deciding whether a statement is knowing and voluntary, a court considers the totality of circumstances under which it is made, and any inducement is merely one factor in the analysis. State v. Blank , 04-0204 (La. 4/11/07), 955 So.2d 90, cert. denied , 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007) ; State v. Platt , 43,708 (La. App. 2 Cir. 12/3/08), 998 So.2d 864, writ denied , 09-0265 (La. 11/6/09), 21 So.3d 305.
Testimony of the interviewing police officer alone may be sufficient to prove that the statement was given freely and voluntarily. State v. Henderson , 31,986 (La. App. 2 Cir. 8/18/99), 740 So.2d 240.
The trial court's finding that Defendant's statements were made freely and voluntarily is supported by the evidence; and, thus, it did not err in denying the motion to suppress.
At the free and voluntary hearing, Det. Bonillas testified that he first interviewed Defendant on February 23, 2016. Prior to conducting the interview, he read Defendant his Miranda rights, and Defendant acknowledged that he understood his rights by signing a form and providing a statement. This form and a video recording of Defendant signing the form were introduced into evidence. During the interview, Defendant stated that he was the getaway driver for Lee Lewis and Amanda. Following this interview, Defendant was arrested for aggravated flight for fleeing from Cpl. Mayes during the traffic stop.
Det. Bonillas testified that he also interviewed Defendant on February 24, 2016, at the police station. Prior to conducting the interview, he read Defendant his Miranda rights, and Defendant acknowledged that he understood his rights by signing a form and providing a statement. This form was introduced into evidence. An audio and video recording of Defendant signing the form and the interview that followed was introduced into evidence and played for the trial court. During this interview, Defendant admitted to entering the victim's house, removing items from the house and setting fire to the house. Also during the interview, Det. Johnny Elie said to Defendant that he "needs a voice" and implored Defendant to let the officers be his voice. Det. Elie later commented that he was "here to help" Defendant. Following this interview at the police station, officers transported Defendant to the crime scene. Audio and video recordings of the transport and of walking through the crime scene were played for the trial court. At the conclusion of the walkthrough, Det. Elie asked Defendant if anyone forced or *521 coerced him to walk through the crime scene. Defendant responded that he volunteered.
In his testimony, Det. Bonillas denied making any promises to Defendant or threatening him to get him to talk. He stated that at no time during the interviews did Defendant indicate that he wanted to terminate the interview or that he wanted to speak to an attorney. He noted that Defendant appeared to be in his right mind and gave logical, yet sometimes deceptive, responses to the detectives' questions. He denied hearing Det. Elie make any promises to or threaten Defendant.
On cross-examination, Det. Bonillas confirmed that Defendant was being questioned primarily in relation to the homicide, not the aggravated flight. Defense counsel questioned why Det. Bonillas did not write on the Miranda rights form the offense for which Defendant was under arrest or investigation. Det. Bonillas responded, "Sometimes I leave it blank and sometimes I fill it in. I mean, the law only requires me to read him his Miranda rights." Defense counsel further questioned Det. Bonillas about a statement from his report that "On the return [from the walkthrough of the crime scene], Lewis asked Detective Elie and I how speaking to investigators would help his case." In explanation of that statement, Det. Bonillas testified:
Yeah, I told him that -- well, I can't remember verbatim, but I believe I told him something about that he would have to get with his lawyer and it would be up to the judge and up to the District Attorney's office on his statements to us, how they would be weighed in court.
The trial court found Defendant's statements to be free and voluntary, stating:
All right. I, obviously, have been sitting here since 2:45 listening and watching all of this, and I didn't see any threats. I didn't see anything except for what I would refer to and what I just stated were interrogation techniques the police use all the time.
I do think all the statements were made freely and voluntarily. He didn't -- Mr. Lewis wasn't impaired. He was advised he had a right to an attorney. He never asked for an attorney. He never stopped to say I need advice, I don't want to talk to you anymore. There was no threats, there was no promises. Saying let us be your voice, I mean, the detectives are the ones that write the reports that go to the DA and that's what Detective Elie says. I mean, I don't think it was improper. I don't think it was coercion, so I think all the statements that were made and that we just watched were made freely and voluntarily after being advised of his rights.
The trial court's conclusion that Defendant's statements were freely and voluntarily made is supported by the evidence. Law enforcement officers advised Defendant of his rights prior to each interview, and Defendant waived these rights. He never asked for a lawyer or to terminate the interview. The few comments made by Det. Elie were not coercive and do not constitute improper inducement. The trial court properly denied the motion to suppress Defendant's statements.
Accordingly, this assignment of error lacks merit.
Motion to Suppress Evidence
Defendant argues that the trial court erred in denying his motion to suppress evidence. He contends that the consent to search the Accord given by Sanchasity is tainted by an illegal detention; and, thus, the evidence seized as a result of the search should have been suppressed.
*522 The state argues that the trial court did not err in denying the motion to suppress. It notes that Sanchasity signed a consent form to search the Accord and that law enforcement obtained a search warrant as a prophylactic measure to ensure there could be no question as to the validity of the search. It contends that Sanchasity voluntarily cooperated with the investigation and gave a statement to clear her name and that there is no evidence to support any illegal detention of her.
The right of every person to be secure in his person, house, papers and effects, against unreasonable searches and seizures, is guaranteed by the Fourth Amendment to the United States Constitution and Article I, § 5, of the 1974 Louisiana Constitution. It is well settled that a search and seizure conducted without a warrant issued on probable cause is per se unreasonable unless the warrantless search and seizure can be justified by one of the narrowly drawn exceptions to the warrant requirement. State v. Thompson , 02-0333 (La. 4/9/03), 842 So.2d 330 ; State v. Tatum , 466 So.2d 29 (La. 1985) ; State v. Ledford , 40,318 (La. App. 2 Cir. 10/28/05), 914 So.2d 1168. To claim the protection of the Fourth Amendment, the claimant must have a legitimate expectation of privacy in the place of intrusion and the expectation must be one that society is prepared to recognize as reasonable. Minnesota v. Olson , 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990).
La. C. Cr. P. art. 703 states that a defendant may move to suppress any evidence from use at the trial on the merits on the ground that it was unconstitutionally obtained. When the constitutionality of a warrantless search or seizure is placed at issue by a motion to suppress the evidence, the state bears the burden of proving that the search and seizure were justified pursuant to one of the exceptions to the warrant requirement. La. C. Cr. P. art. 703(D) ; State v. Johnson , 32,384 (La. App. 2 Cir. 9/22/99), 748 So.2d 31.
In reviewing the correctness of the trial court's pretrial ruling on a motion to suppress, the appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress and may review the entire record, including testimony at trial. State v. Monroe , 49,365 (La. App. 2 Cir. 11/19/14), 152 So.3d 1011. Great weight is placed upon the trial court's ruling on a motion to suppress in regard to the finding of facts because it had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Crews , 28,153 (La. App. 2 Cir. 5/08/96), 674 So.2d 1082. Accordingly, this court reviews the trial court's ruling on a motion to suppress under the manifest error standard for factual determinations, while applying a de novo review to its findings of law. State v. Hemphill , 41,526 (La. App. 2 Cir. 11/17/06), 942 So.2d 1263, writ denied , 06-2976 (La. 3/9/07), 949 So.2d 441.
It is well settled that a warrantless search conducted pursuant to a valid consent is permitted by the Louisiana and United States Constitutions. Schneckloth v. Bustamonte , 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973) ; State v. Raheem , 464 So.2d 293 (La. 1985) ; State v. Crews , supra . To be valid, consent must be (1) free and voluntary, in circumstances that indicate the consent was not the product of coercion, threat, promise, pressure or duress that would negate the voluntariness; and (2) given by someone with apparent authority to grant consent, such that the police officer reasonably believes the person has the authority to grant and consent to the search. State v. Bates , 51,890 (La. App. 2 Cir. 2/28/18), 246 So.3d 672, citing United States v. Matlock , 415 U.S. 164, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974), *523 and State v. Howard , 49,965 (La. App. 2 Cir. 6/24/15), 169 So.3d 777, writ granted , 15-1404 (La. 12/16/16), 212 So.3d 1168, and aff'd , 15-1404 (La. 5/3/17), 226 So.3d 419. However, if consent was obtained after an illegal detention, intrusion or entry, the consent is valid only if it was the product of a free will and not the result of an exploitation of the previous illegality. State v. Bates , supra . Among the factors to consider in determining whether the consent was sufficiently attenuated from the unlawful conduct to be a product of a free will are whether the law enforcement officers adequately informed the individual that he or she need not comply with the request, the temporal proximity of the illegality and the consent, the presence of intervening circumstances and, particularly, the purpose and flagrancy of the official misconduct. Id.
If evidence was derived from an unreasonable search or seizure, the proper remedy is exclusion of the evidence from trial. State v. Benjamin , 97-3065 (La. 12/1/98), 722 So.2d 988 ; State v. Bates , supra .
At the motion to suppress hearing, Det. Bonillas testified about officers locating Defendant, Sanchasity and Amanda at the Merryton Inn. Officers obtained a search warrant for the hotel rooms occupied by the suspects and found keys to two vehicles parked outside the hotel rooms, i.e., the Avalanche and the Accord. Both vehicles were impounded. Det. Bonillas stated that Sanchasity was transported to the police station to be questioned as a witness. Officers did not believe she was involved in the homicide, so they did not read her the Miranda rights. Sanchasity told officers that the Accord belonged to her, and she signed a consent to search form, which was introduced into evidence. An audio and video recording of Sanchasity signing the consent form was also introduced into evidence. Det. Bonillas testified that he did not make any promises or threats to Sanchasity regarding the consent to search.
Det. Bonillas further testified that he advised Det. Clark that consent had been obtained to search the Accord, and Det. Clark and Cpl. John Madjerick began processing the vehicle. Cpl. Madjerick opened the driver's side door, saw a Ford key in the compartment near the door handle and deduced that the key might be to the F250 stolen from Mr. Savage's house. Det. Bonillas stated that Det. Clark then stopped the search temporarily in order to obtain a search warrant. He instructed Det. Joey Brown to obtain a search warrant for the Accord, and the search warrant was introduced into evidence. Sanchasity signed a second consent to search form, which was also introduced into evidence. Det. Bonillas confirmed that no items were recovered pursuant to the second consent form. After the search warrant was secured, officers resumed searching the Accord and seized a black bag from the back seat, which contained Mr. Savage's wallet and two prescription bottles bearing his name.
On cross-examination, defense counsel questioned Det. Bonillas as to why the search was stopped to obtain a warrant if he believed the consent to have been valid. Det. Bonillas explained:
Well it's always -- like I would say in case there's any issues that might come up with that consent form. Like we're here today. It's probably always best to get a search warrant once you find evidence in a vehicle.
He added, "[I]n my experience if we -- if there's any doubt even if it's one percent just go ahead and get a warrant."
Det. Elie testified that he was present when Sanchasity and Det. Bonillas signed the consent to search form. He stated that *524 he made no promises or threats to Sanchasity in connection with the consent. He testified that she appeared to answer questions in a coherent, logical manner; that she did not appear to be under the influence of any drugs or alcohol; and that her consent was freely and voluntarily given.
After taking the matter under advisement, the trial court denied the motion to suppress. It determined that Sanchasity freely and voluntarily gave her consent to search; and, therefore, the key to the F250 was obtained pursuant to her valid consent. It also determined that the items inside the black bag were obtained pursuant to a valid search warrant.
The trial court did not err in denying Defendant's motion to suppress the items seized from the Accord. Law enforcement officers seized the key to Mr. Savage's F250 following Sanchasity, who owned the Accord, giving valid consent to search. Her consent was in no way coerced. Law enforcement officers seized a black bag containing medication prescribed to Mr. Savage pursuant to a valid search warrant.
Accordingly, this assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, we affirm the conviction and sentence of Defendant Cameron Lewis.
AFFIRMED.

The trial court prepared the ruling in November 2017, but did not sign and file it until after the trial began.

Throughout the record, Amanda Williams is also referred to by other names including Bailey, Bailey Williams and Amanda Compton.

The bill of indictment charged Defendant with second degree murder in violation of La. R.S. 14:30.1, but it did not specify if this charge was based on specific intent pursuant to La. R.S. 14:30.1(A)(1) and/or felony murder pursuant to La. R.S. 14:30.1(A)(2). The jury instructions charged the jury as to felony murder with the underlying felonies of aggravated arson and aggravated burglary.